## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

ZANOUBIA E.,

         *Plaintiff,*

v.

COMMISSIONER OF SOCIAL
SECURITY,

         *Defendant.*

_____/

Case No. 1:23-cv-11276

Patricia T. Morris
United States Magistrate Judge

## OPINION AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 11, 14)

### A.    Introduction and Procedural History

Zanoubia E. appeals the Commissioner of Social Security's final decision to deny her application for supplemental security income benefits ("SSI"). After she protectively applied for SSI in August 2020, alleging that she became disabled in June 2016, the Administration denied Zanoubia's claims both at the initial level and on reconsideration. (ECF No. 7-1, PageID.45, 129, 145, 260, 325). Zanoubia then appealed to an ALJ who denied her claims after conducting a hearing. (*Id.* at PageID.32–53, 61–89). Next, she appealed the ALJ's decision to the Appeals Council who denied review. (*Id.* at PageID.26).

Zanoubia later filed a complaint seeking judicial review of the ALJ's final

1

decision.  (ECF No. 1).  Both parties consented to the undersigned, magistrate judge "conducting all proceedings in this case, including entry of a final judgment on all post-judgment matters."  (ECF No. 9, PageID.529).  The parties have now filed cross-motions for summary judgment.  (ECF Nos. 11, 14).

## B.    Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g) (2018).  The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal quotation marks omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ.  *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility."  *Cutlip v. Sec'y of Health & Human Servs.*, 25

F.3d 284, 286 (6th Cir. 1994).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286 (internal citations omitted).

### C.    Framework for Disability Determinations

Disability benefits are available only to those with a "disability."  *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A) (2018).  The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your impairment(s).  If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.
>
> (iii) At the third step, we also consider the medical severity of your impairment(s).  If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this

> subpart and meets the duration requirement, we will find that you are disabled.
>
> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.
>
> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work.  If you can make an adjustment to other work, we will find that you are not disabled.  If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520 (2023); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003).  The claimant must provide evidence establishing the residual functional capacity, which "is the most [the claimant] can still do despite [his or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1) (2023).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled.  *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006).  At the fifth step, the Commissioner is required to

show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g) (2022)).

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Zanoubia was not disabled. (ECF No. 7-1, PageID.48). At step one, the ALJ found that Zanoubia had not engaged in substantial gainful activity since August 31, 2020, her application date. (*Id.* at PageID.38). At step two, the ALJ concluded that Zanoubia had the following severe impairments: depression, cervical spondylosis, lumbar spondylosis, cervical radiculopathy, and lumbar radiculopathy. (*Id.*) The ALJ found that Zanoubia had several nonsevere medically determinable impairments: sleep apnea, deviated nasal septum, gastroesophageal reflux disease, hyperlipidemia, hypothyroidism, enthesopathy of hip, tendinopathy of left gluteal region, and obesity. (*Id.* at PageID.38–39). At step three, the ALJ found that none of Zanoubia's severe impairments met or medically equaled a listed impairment. (*Id.* at PageID.39–41). Next, the ALJ determined that Zanoubia had a residual functional capacity ("RFC") to perform light work with the following limitations:

> she can never climb ladders, ropes, or scaffolds. She can occasionally climb ramps and stairs. She can occasionally balance, stoop, kneel, crouch, and crawl. She cannot work at unprotected heights. The work is limited to simple tasks. The claimant needs the option to alternate between sitting and standing in 10-minute intervals.

(*Id.* at PageID.41).  At step four, the ALJ found that Zenobia had no past relevant work.  (*Id.* at PageID.46).  Last, the ALJ found at step five that Zanoubia could perform work that existed in significant numbers throughout the national economy. (*Id.* at PageID.46–47).

### E. Background

#### 1. Medical Evidence

Zanoubia's medical records reveal that she sought treatment for her impairments as early as May 2020.  (*Id.* at PageID.348).  At an appointment that month, Zanoubia complained of pain in her back, legs, and joints.  (*Id.*)  On examination, she displayed muscle spasms and tenderness.  (*Id.* at PageID.349–50).

After receiving Zanoubia's application for benefits, the Administration ordered a physical consultative examination in January 2021.  (*Id.* at PageID.409). At this examination, Zanoubia reported arthritis in her left hip, and she complained of chronic pain in her back, neck, and left shoulder caused by herniated discs in her cervical and lumbar spine.  (*Id.* at PageID.409–10).  Although she displayed "[m]ild" tenderness in her left shoulder, she presented with "[n]o obvious spinal deformity, swelling, or muscle spasm . . . ."  (*Id.* at PageID.411).  Her gait and stance appeared normal and she did not rely on a cane or walker.  (*Id.*)  She "slowly" performed a "tandem walk, heel walk, and toe walk."  (*Id.*)  In addition, Zanoubia's range of motion was generally normal, although sometimes "slightly decreased."  (*Id.* at

PageID.411–12).  For example, she could abduct her right shoulder 150 degrees, but she could only abduct her left shoulder 140 degrees.  (*Id.* at PageID.411).  She could also perform seventy percent of a full "squat" and seventy-five percent of a complete "bend" at the hips.  (*Id.*)

The following October, Zanoubia presented to the Sports Medicine Clinic seeking a physical therapy prescription.  (*Id.* at PageID.511–12).  Zanoubia explained that she had been prescribed physical therapy the prior February but could not attend due to a lack of transportation.  (*Id.* at PageID.512).  On examination at the clinic, Zanoubia displayed a limited range of motion in her lumbar spine and complained of severe pain.  (*Id.* at PageID.511–12).  A physical therapist conducted a follow-up examination a few weeks later.  (*See id.* at PageID.475–76).  Following this examination, the clinic prescribed Zanoubia with three, fifty-five-minute therapy sessions per week for the following month.  (*Id.* at PageID.476–77).  Following her initial round of physical therapy, Zanoubia reported improvement in her symptoms.  (*Id.* at PageID.487, 493, 511).  Still, she continued to complain of difficulty standing, carrying objects, and walking, and her therapist recommended additional treatment.  (*Id.*)

A few months later, Zanoubia presented for an MRI of her cervical and lumbar spine.  The MRI revealed "degenerative disc disease with foraminal narrowing, but no high-grade canal stenosis."  (*Id.* at PageID.43 (citing *id.* at PageID.500–03)).  On

follow-up, Zanoubia demonstrated joint tenderness; "positive lumbar facet loading, left straight leg raise, and Spurling's, Faber's, and Ober's tests; and slightly reduced left elbow, wrist, finger, and grip strength." (*Id.* (citing *id.* at PageID.512–15)). But she also "maintained full strength in her cervical spine, left shoulder with adduction and abduction, wrist with flexion, and bilateral hip, knee, supraspinatus, infraspinatus, and subscapularis as well as intact sensation, motor function, and deep tendon reflexes." (*Id.* (citing *id.* at PageID.512–15)).

### 2.      Medical Opinions

Following Zanoubia's application for SSI, the Administration requested a medical source statement from a consultative examiner, Doctor Shelby-Lane. (*Id.* at PageID.409–12). After examining Zanoubia, Doctor Shelby-Lane opined that Zanoubia could "occasionally" stand, lift, push, pull, bend, and walk. (*Id.* at PageID.412, 416)

Soon after, a nonexamining expert opined that Zanoubia could lift up to twenty-five pounds for two-thirds of an eight-hour workday and stand or walk for up to six hours per workday. (*Id.* at PageID.100). Her use of her arms and hands were otherwise unrestricted. (*Id.* at PageID.100–01). The examiner also found no restrictions concerning Zanoubia's ability to balance, kneel, crouch, or crawl, and he determined that Zanoubia could "frequently" bend at the waist and climb ladders, ropes, scaffolds, ramps, and stairs. (*Id.*) On reconsideration, another nonexamining

physician reached the same conclusions regarding Zanoubia's functional abilities. (*Id.* at PageID.114–15).

Zanoubia's treating physician at the Sports Medicine Clinic, Doctor Ali Makki, also submitted a medical source statement.   (*Id.* at PageID.504–09). Compared to the other medical sources, Doctor Makki found Zanoubia's functional abilities to be significantly restricted.  For example, he opined that Zanoubia could walk for no more than one hour throughout the workday, and that she could spend no more than three hours lifting objects. (*Id.* at PageID.504–05).  He also suggested that Zanoubia could not lift or carry more than ten pounds at once, nor climb ladders, ropes, scaffolds, ramps, or stairs. (*Id.* at PageID.504, 507).  Unlike the other medical sources, Doctor Makki found that Zanoubia's impairments limited her use of her arms and hands, suggesting that she could "finger[]" and "feel[]" objects for up to two-thirds of an eight-hour workday and that she could handle, push, pull, or reach for objects for up to one-third of a workday.  (*Id.* at PageID.506).

### 3.  The Administrative Hearing

Zanoubia testified at a hearing before the ALJ in April 2022.  (*Id.* at PageID.61).   At the hearing, she attributed her inability to work to "pain and numbness" in her "hip, neck, and back."  (*Id.* at PageID.71).  Her pain generally developed whenever she "s[a]t down" and it affected the left side of her body more than the right.  (*Id.*)  Zanoubia explained that medication was generally ineffective

at relieving her pain.  (*Id.*)  On a scale of one through ten, with ten characterizing pain severe enough to warrant an "emergency room" visit, Zanoubia described her pain as a nine without medication, and a "seven or eight" with medication.  (*Id.*)  Her only effective means of pain relief, Zanoubia explained, was to lie down "intermittently" throughout the day.  (*Id.* at PageID.71, 73, 78).

When asked how long she could sit or stand continuously, Zanoubia testified that she had to change positions every fifteen minutes.  (*Id.* at PageID.71–72).  She could not bend, kneel, squat, or crawl without "severe" pain.  (*Id.* at PageID.73).  Nor could she walk for more than "three" to "four" minutes or drive for more than "two" to "three" minutes.  (*Id.* at PageID.68, 72).  Because she did not walk long distances, Zanoubia felt she had no need for a cane or a walker.  (*Id.* at PageID.72).

Zanoubia also testified that her impairments affected her arms.  Although she felt pain in both arms, she described the pain in her left arm as "severe."  (*Id.* at PageID.73).  She testified that she could not lift more than four pounds at once.  (*Id.*)

#### 4.   The Vocational Expert's Testimony

After Zanoubia testified, the ALJ examined a Vocational Expert ("VE").  (*Id.* at PageID.80–81).  The ALJ asked the VE to assume a hypothetical person with the same age, education, and work experience as Zanoubia who could perform a full range of "light" work except that the individual is limited to: (1) "frequent[]"

climbing of ladders, ropes, scaffolds, ramps, and stairs,' (2) "simple tasks"; and (3) "frequent[]" crouching, kneeling, and crawling. (*Id.* at PageID.81).

The VE testified that an individual with these limitations could perform work as a housekeeping cleaner, light work, approximately 250,000 jobs, Dictionary of Occupational Titles ("DOT") code 323.687-014; a garment sorter, light work, 145,000 jobs, DOT code 222.687-014; and a cafeteria attendant, light work, 130,000 jobs, DOT code 311.677-010. (*Id.*)

The ALJ then asked the VE to assume a hypothetical individual who: (1) could not "climb any ladders, ropes, or scaffolds"; (2) "occasionally climb ramps and stairs"; (3) "occasionally balance, stoop, kneel, crouch, and crawl"; (4) could not work at "unprotected heights"; and (5) could only perform "simple tasks." (*Id.* at PageID.81). The VE responded that this individual could perform the same work as the individual described in the ALJ's first hypothetical. (*Id.* at PageID.82).

Next, the ALJ asked the VE to assume the same individual from the prior hypothetical, but to further assume that the individual must "be able to alternate between sitting and standing" every thirty minutes. (*Id.*) The VE testified that this individual could work as a "final inspector," light work, approximately 50,000 jobs, DOT code 727.687-054, an electrical accessories assembler, light work, 180,000 jobs, DOT code 729.687-010, and a "plastic hospital product assembler," light work, 145,000 jobs, DOT code 712.687-010. (*Id.*)

11

The ALJ then asked whether the VE's answers would change if the individual required the freedom to alternate between sitting and standing every ten minutes. (*Id.* at PageID.82–83).  The VE responded that this limitation would not change her answers provided that the individual would not be "off task more than [ten percent] of the workday."  (*Id.* at PageID.83).

The VE also testified that further restricting any of the prior three hypotheticals to "sedentary" work would not preclude the individual from performing jobs that exist in significant numbers.  (*Id.* at PageID.83).  But the hypothetical individual would not be able to work under any of the previous hypotheticals if the individual had to lie down for ten to fifteen minutes out of every hour.  (*Id.* at PageID.84–85).  Last, the VE explained her testimony was consistent with the DOT, except that she relied on her "professional experience, research, and education" to answer some of the ALJ's hypotheticals.  (*Id.* at PageID.85).

### F.  Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The newly promulgated regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, distinguish between acceptable medical sources, medical sources and nonmedical sources. An acceptable medical source means a medical source who is a:

(1)  Licensed physician (medical or osteopathic doctor);

(2)  Licensed Psychologist, which includes:

  (i)  A licensed or certified psychologist at the independent practice level; or

  (ii)  A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3)  Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4)  Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;

(5)  Qualified speech-language pathologist for speech or language impairments only. For this source, qualified means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language pathology from the American Speech-Language-Hearing Association;

(6)  Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only [];

(7)  Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice []; or

(8)    Licensed Physician Assistant for impairments within his or her licensed scope of practice [].

20 C.F.R. § 404.1502(a).

A medical source is "an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law." *Id.*, § 404.1502(d).

In contrast, a nonmedical source means "a source of evidence who is not a medical source." *Id.*, § 404.1502(e). "This includes, but is not limited to: (1) You; (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy." *Id.*

The SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." *Id.*, § 404.1520c(a). "The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.* The

SSA will consider several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case. *Id.*

Of these factors, the first is "supportability." This factor considers that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.*, § 404.1520c(c)(1).

The SSA will also consider the "consistency" of the claim. This includes the consideration that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.*, § 404.1520c(c)(2).

In addition, the SSA will consider the "[r]elationship with claimant[.]" *Id.*, § 404.1520c(c)(3). This factor will include the analysis of:

(i)     Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(ii)    Frequency of examinations. The frequency of your visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(iii)   Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the

level of knowledge the medical source has of your
impairment(s);

(iv)   Extent of the treatment relationship. The kinds and extent of
examinations and testing the medical source has performed or
ordered from specialists or independent laboratories may help
demonstrate the level of knowledge the medical source has of
your impairment(s);

(v)   Examining relationship. A medical source may have a better
understanding of your impairment(s) if he or she examines you
than if the medical source only reviews evidence in your folder[.]

*Id.* The fourth factor of the SSA's analysis is "specialization." In making this

determination, the SSA will consider "[t]he medical opinion or prior administrative

medical finding of a medical source who has received advanced education and

training to become a specialist may be more persuasive about medical issues related

to his or her area of specialty than the medical opinion or prior administrative

medical finding of a medical source who is not a specialist in the relevant area of

specialty." *Id.*, § 404.1520c(c)(4).

Finally, the SSA will consider "other factors." These may include any other

factors that "tend to support or contradict a medical opinion or prior administrative

medical finding." *Id.*, § 404.1520c(c)(5). "This includes, but is not limited to,

evidence showing a medical source has familiarity with the other evidence in the

claim or an understanding of our disability program's policies and evidentiary

requirements." *Id.* Further, when the SSA considers "a medical source's familiarity

with the other evidence in a claim, we will also consider whether new evidence we

receive after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive." *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation requirements." The ALJ will consider "source-level articulation." Pursuant to this requirement, "[b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record." *Id.*, § 404.1520c(b)(1).

"Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate." *Id.* The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important

factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be." *Id.*, § 404.1520c(b)(2). As such, the SSA "will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record." *Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported" and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors[] for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.*, § 404.1520c(b)(3).

The regulations clarify that the SSA is "not required to articulate how we considered evidence from non-medical sources using the requirements of paragraphs (a) through (c) of this section." *Id.*, § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how we considered such evidence in our determination or

decision, even under § 404.1520c." *Id.*, § 404.1520b(c).  The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities;" "[d]isability examiner findings," meaning, "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate issue about whether you are disabled;" and "[s]tatements on issues reserved to the Commissioner[;]" these statements include:

(i)     Statements that you are or are not disabled, blind, able to work, or able to perform regular or continuing work;

(ii)    Statements about whether or not your impairment(s) meets or medically equals any listing in the Listing of Impairments[];

(iii)   Statements about what your residual functional capacity is using our programmatic terms about the functional exertional levels [] instead of descriptions about your functional abilities and limitations[];

(iv)    Statements about whether or not your residual functional capacity prevents you from doing past relevant work[];

(v)     Statements that you do or do not meet the requirements of a medical-vocational rule[]; and

(vi)    Statements about whether or not your disability continues or ends when we conduct a continuing disability review[.]

*Id.*, § 404.1520b(c).

The regulations also provide that "[b]ecause a decision by any other governmental and nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on us

and is not our decision about whether you are disabled or blind under our rules." *Id.*, § 404.1504. Therefore, the Commissioner "will not provide any analysis in our determination or decision about a decision made by any other governmental or nongovernmental entity about whether you are disabled, blind, employable, or entitled to benefits." *Id.* The Commissioner will, however, "consider all of the supporting evidence underlying the other governmental or nongovernmental entity's decision that we receive as evidence in your claim[.]" *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.*, § 404.1502(f). Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from your statements (symptoms)." *Id.* Further, "[s]igns must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.*, § 404.1502(g). Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques[,]" and "diagnostic techniques include chemical tests (such as blood tests), electrophysiological studies

(such as electrocardiograms and electroencephalograms), medical imaging (such as X-rays), and psychological tests." *Id.*, § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain. "In considering whether you are disabled, we will consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. We will consider all your statements about your symptoms, such as pain, and any description your medical sources or nonmedical sources may provide about how the symptoms affect your activities of daily living and your ability to work[.]" *Id.*, § 404.1529(a).

But the SSA clarified, "however, statements about your pain or other symptoms will not alone establish that you are disabled. There must be objective medical evidence from an acceptable medical source that shows you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence about your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled." *Id.*, § 404.1529(a).

Further, "[i]n evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings, and statements about how your symptoms affect you." *Id.*, § 404.1529(a). The SSA clarified that it will "then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work." *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms." This other information may include "[t]he information that your medical sources or nonmedical sources provide about your pain or other symptoms (e.g., what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living)," which "is also an important indicator of the intensity and persistence of your symptoms." *Id.*, § 404.1529(c)(3).

"Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that your medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the

objective medical evidence and other evidence, will be taken into account…We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your medical sources, and observations by our employees and other persons[.]" *Id.* The regulations establish that "[f]actors relevant to your symptoms, such as pain, which we will consider include []:

(i)     [D]aily activities;

(ii)    The location, duration, frequency, and intensity of . . . pain;

(iii)   Precipitating and aggravating factors;

(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)     Treatment, other than medication, . . . received for relief of . . . pain;

(vi)    Any measures . . . used to relieve . . . pain.

*Id.*

The new regulations also impose a duty on the claimant: "In order to get benefits, you must follow treatment prescribed by your medical source(s) if this treatment is expected to restore your ability to work." *Id.*, § 404.1530(a). Stated differently, "[i]f you do not follow the prescribed treatment without a good reason, we will not find you disabled or, if you are already receiving benefits, we will stop paying you benefits." *Id.*, § 404.1530(b). Acceptable (or "good") reasons for failure to follow prescribed treatment include:

(1)   The specific medical treatment is contrary to the established teaching and tenets of your religion;

(2)   The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;

(3)   Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;

(4)   The treatment because of its magnitude (e.g. open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for you; or

(5)   The treatment involves amputation of an extremity, or major part of an extremity.

*Id.*, § 404.1530(c).

### G.   Analysis

Zanoubia argues that the ALJ erred in determining her RFC by improperly discounting her treating physician's opinions on her functional abilities.  (ECF No. 11, PageID.535).  She explains that this error tainted the ALJ's step five finding. (*See id.* at PageID.541–42).  Citing the VE's testimony that an individual with the same age, education, experience, and functional abilities as Zanoubia could perform a significant number of jobs in the national economy, the ALJ determined that Zanoubia was not disabled.  (ECF No. 7-1, PageID.47).  But if the RFC presented to the VE did not accurately reflect Zanoubia's abilities, then the VE's testimony could not have depicted her ability to perform work in the national economy.  *See Varley*

*v. Sec'y of Health & Hum. Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). Thus, Zanoubia reasons, the Commissioner did not carry its burden of proving that she was disabled at step five.

An ALJ must consider all medical opinions and explain how persuasive he or she found the opinions of each medical source. 20 C.F.R. § 416.920c(a)–(b)(1) (2023). In doing so, an ALJ may not "defer or give any specific evidentiary weight, including controlling weight" to any medical source—it is the ALJ's responsibility to freely weigh each medical opinion. *Id.* When considering the persuasiveness of a medical opinion, an ALJ must consider (1) how well the opinion is supported by objective evidence and the medical source's explanations, (2) the opinion's consistency with the entire record, (3) the source's "[r]elationship with the claimant," (4) the specialization of the medical source, and (5) any other factor that may "support or contradict" the medical opinion. *Id.* § 416.920c(c).

The regulations explain that "supportability" and "consistency" are the most important of these factors. *Id.* § 416.920c(c). Accordingly, an ALJ need only discuss these two factors in his or her decision. *Id.* The ALJ's discussion must be detailed enough to allow a reviewing court "to determine whether" the ALJ's decision "was supported by substantial evidence." *Hardy v. Comm'r of Soc. Sec.*, No. 20-10918, 2021 WL 3702170, at *4 (E.D. Mich. Aug. 13, 2021) (quotation marks omitted) (quoting *Vaughn v. Comm'r of Soc. Sec.*, No. 20-1119, 2021 WL 3056108, at *11

(W.D. Tenn. July 20, 2021)).

Zanoubia's treating physician, Doctor Makki, filled out a medical source statement in which he opined that Zanoubia could perform a limited range of sedentary[1] work. (*See* ECF No. 7-1, PageID.504–09). Throughout an eight-hour workday, Doctor Makki's believed that Zanoubia could stand for no more than two hours, walk for no more than one hour, and spend no more than three hours lifting objects. (*Id.* at PageID.504–05). She could not lift or carry more than ten pounds at once. (*Id.* at PageID.504). Nor could she climb ladders, ropes, scaffolds, ramps, or stairs. (*Id.* at PageID.507). In addition, Dr. Makki found that Zanoubia could not stoop, kneel, crouch, or crawl—although she could "occasionally" balance.[2] (*Id.*) Doctor Makki stated that Zanoubia would need to change positions after standing for more than one hour, sitting for more than two hours, or walking for more than ten minutes. (*Id.* at PageID.505). Last, Doctor Makki found that Zanoubia's impairments limited her use of her arms and hands, suggesting that she could "finger[]" and "feel[]" objects for up to two-thirds of an eight hour workday and that

---

[1] The regulations define "sedentary" jobs as those that involve occasional "standing and walking" and occasional "lifting or carrying" of small items "like socket files" or "ledgers." 20 C.F.R. § 416.927(a) (2023). Sedentary work requires lifting of no more than ten pounds at once time. *Id.*

[2] The Administration defines "balancing" as "maintaining body equilibrium to prevent falling when walking, standing, crouching, or running on narrow, slippery, or erratically moving surfaces." SSR 96-9p, 1996 WL 374185, at *7 (July 2, 1996).

she could handle, push, pull, or reach for objects for up to one-third of a workday.[3]
(*Id.* at PageID.506).

For the most part, the ALJ found Doctor Makki's opinions unpersuasive and
imposed a less restrictive RFC.  The ALJ, for example, found that Zanoubia's
impairments did not limit her use of her arms and hands, and while Doctor Makki
believed that Zanoubia could not stand or walk for more than three hours in a
workday, the ALJ found that Zanoubia could be on her feet for up to six hours.  (*Id.*
at PageID.41).  The ALJ also believed that Doctor Makki exaggerated Zanoubia's
ability to lift, finding that Zanoubia could lift up to twenty pounds at once, but no
more than ten pounds frequently.  (*Id.*)  She also found that Zanoubia could
"occasional[ly]" climb ramps and stairs.  (*Id.*)

Still, the ALJ did find some of Doctor Makki's opinions to be persuasive.  For
instance, the ALJ agreed that Zanoubia could not climb ladders, ropes, or scaffolds.
The ALJ also agreed that Zanoubia could occasionally "balance"—although she
found that Zanoubia could also occasionally stoop, kneel, crouch, or crawl.  (*Id.*)  As
for Zanoubia's need to alternate between sitting and standing, the ALJ agreed that
Zanoubia had significant limitations.  (*Id.*)  In fact, the ALJ found greater limitations,

---

[3] *See generally* SSR 85-15, 1985 WL 56857, at *7 (Jan. 1, 1985) (defining the terms
"reaching, handling, fingering, and feeling").

stating that Zanoubia required the ability to alternate between sitting and standing at least every ten minutes. (*Id.*)

Although Zanoubia claims that the ALJ did not "properly evaluate" Doctor Makki's medical source statement, it is not clear what, precisely, she believes rendered the ALJ's evaluation "improper." (ECF No. 11, PageID.534). Throughout her briefing, Zanoubia characterizes the ALJ's discussion of Doctor Makki's opinions as a "legal error" and accuses the ALJ of failing to comply with the "standards" and articulation requirements found in 20 C.F.R. § 416.920c(c). (*E.g.*, *id.* at PageID.534, 536, 538, 540; ECF No. 15, PageID.566–67 (quoting *Joseph F. v. Comm'r of Soc. Sec.*, No. 22-12593, 2023 WL 3853682, at *13 (E.D. Mich. June 6, 2023)). If the ALJ did not follow the "legal standards" and procedural requirements set forth in § 416.920c(c), then remand would be necessary regardless of whether the ALJ stumbled upon an RFC that she could have otherwise supported with substantial evidence. *Rabbers v. Comm'r of Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009). Yet despite her characterization of the ALJ's discussion as a "legal error," the substance of Zanoubia's arguments appear to challenge the ALJ's factfinding. That is, Zanoubia challenges not whether the ALJ complied with § 416.920c(c)'s standards for evaluating medical opinions, but whether the ALJ drew reasonable conclusions from those standards. (*See, e.g.*, ECF No. 11, PageID.540 (accusing the ALJ of "cherry pick[ing]" unfavorable evidence and finding a

"clearly" under-restrictive RFC)).   In any event, regardless of how Zanoubia's argument may be construed, I find that the ALJ both complied with the regulations and drew reasonable conclusions.

Start with whether the ALJ applied the correct standards and procedures in evaluating Doctor Makki's opinions.   Although § 416.920c authorizes ALJs to consider a wide range of factors in assessing a medical source statement, the regulation requires ALJs to consider (and explicitly discuss) just two: consistency and supportability.   20 C.F.R. § 416.920(b)(2).   To evaluate an opinion's "consistency," the regulations explain that ALJs should determine how "consistent" the opinion is "with the evidence from other medical sources and nonmedical sources in the claim . . . ."   *Id.* § 416.920c(c)(2).   Supportability, by contrast, evaluates an opinion's internal support: "[t]he more relevant the objective medical evidence and supporting explanations *presented by* a medical source are to support his or her" opinion, "the more persuasive the" opinion "will be."   *Id.* § 416.920c(c)(1) (emphasis added).   Put another way, to assess an opinion's "supportability" is to evaluate the rationale behind the medical source's conclusions. *See* 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1); *see also Vellone ex rel. Vellone v. Saul*, No. 1:20-cv-00261, 2021 WL 319354, at *6 (S.D.N.Y. Jan. 29, 2021).

As to the medical source statement's consistency with the overall record, the ALJ conceded that Zanoubia's "muscle and joint tenderness"; pain; and "slightly

reduced left elbow, wrist, finger, and grip strength supporte[d] some limitation." (ECF No. 7-1, PageID.46). Yet the ALJ found that several other objective signs— such as Zanoubia's "normal gait, stance, sensation, muscle tone, deep tendon reflexes," and upper-back strength—undercut the degree of limitation found by Doctor Makki. (*Id.* at PageID.42–43, 46 (citing *id.* at PageID.348–50, 411–17, 490, 493, 510–14); *see also id.* at PageID.487). The ALJ also reasoned that Zanoubia's "admitted improvements" following "physical therapy," her "ability to" walk "unassisted," and her "refusal" to receive a "left hip injection" despite having experienced pain relief after a previous injection all weighed against Doctor Makki's profound limitations. (*Id.* at PageID.38, 43, 46 (citing *id.* at PageID.493–94, 511, 513–14); *see also id.* at PageID.72). *See Paulovich v. Comm'r of Soc. Sec. Admin.*, No. 5:19-cv-12760, 2021 WL 850996, at *5–6 (E.D. Mich. Feb. 8, 2021) (quoting SSR 16-3p, 2017 WL 5180304, at *9 (Oct. 25, 2017)) (explaining that a claimant's efforts to pursue and follow treatment are relevant when assessing the intensity of the claimant's impairments).

Likewise, the ALJ discussed Doctor Makki's internal support for his opinions. Doctor Makki supported his opinions by citing a collection of symptoms and medical evidence, including: (1) Zanoubia's hand pain and paresthesia; (2) an MRI of Zanoubia's cervical spine revealing bone spurs; (3) Zanoubia's left leg paresthesia, which was confirmed by a positive "FABER test"; (4) a limited range on motion in

Zanoubia's lumbar spine; and (5) a lumbar -spine MRI revealing "disc protrusion" and "facet arthritis." (ECF No. 7-1, PageID.506).

Although the ALJ did not explicitly state that Doctor Makki did not provide adequate support for his opinions, she discussed much of the evidence Doctor Makki relied on throughout her RFC assessment. *Sterner v. Comm'r of Soc. Sec.*, No. 20-12099, 2022 WL 684567, at *3 (E.D. Mich. Feb. 16, 2022) (explaining that an ALJ need not reiterate his or her discussion of unsupportive medical records when assessing a medical source statement) (citing *Parker v. Comm'r of Soc. Sec.*, No. 2:20-cv-10961, 2021 WL 4202060, at *8 (E.D. Mich. July 6, 2021)); *see also Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016).

Like Doctor Makki, the ALJ acknowledged Zanoubia's MRIs; her positive FABER test; her limited left arm strength; and her limited range of movement in her hips, lumbar, and left shoulder. (ECF No. 7-1, PageID.41–46). In fact, the ALJ agreed that this evidence indicated significant functional limitations. For that reason, she rejected opinions from the two nonexamining medical consultants who determined that Zanoubia had almost no postural limitations (such as crouching, crawling, or climbing) and could frequently lift up to twenty-five pounds. (*Id.* at PageID.44–45 (citing *id.* at PageID.99–102, 114–15)). But again, the ALJ also credited other evidence suggesting that Zanoubia retained more functional abilities than Doctor Makki suggested. And some of that evidence, in fact, came from Doctor

31

Makki's own treatment notes.  (*Id.* at PageID.46 (citing *id.* at PageID.513–14)); *see Dolecki v. Comm'r of Soc. Sec.*, No. 2:22-cv-11685, 2023 WL 4751266, at \*10–12 (E.D. Mich. June 6, 2023) (reasoning that conflicts between a medical opinion and the source's treatment notes are relevant to the supportability factor rather than the consistency factor), *report & recommendation rejected on other grounds by Dolecki v. Comm'r of Soc. Sec.*, 2023 WL 4747367 (E.D. Mich. June 6, 2023).

Zanoubia argues that the ALJ's discussion of both factors is too cursory to have been "articulated" for purposes of § 416.920c(b)(2).  That is because, Zanoubia reasons, the ALJ did not "articulat[e]" how she "consider[ed]" either Zanoubia's MRIs or her physical therapy treatment notes.  (ECF No. 11, PageID.536–38).  But that is not true.  Again, the ALJ found that both MRIs indicated that Zanoubia had profound limitations, though not as profound as Doctor Makki indicated.  (*See* ECF No. 7-1, PageID.43–44 (citing *id.* at PageID.500–03)).

And as for Zanoubia's physical therapy, the ALJ discussed Zanoubia's physical therapy several times throughout the decision.  (*Id.* at PageID.38–46).  Indeed, the ALJ recognized that Zanoubia continued to report "ongoing difficulty" standing, walking, and climbing stairs even after completing therapy.  (*Id.* at PageID.42).  But the ALJ also recognized that Zanoubia's physical therapy was "conservative," that Zanoubia admitted some "improvement" following physical therapy, and that Zanoubia's medical records indicate that she often displayed a

normal gait. (*Id.* at PageID.43; *see also id.* at PageID.484–85); *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 725 (6th Cir. 2013) (holding that conservative treatment if a valid consideration when assessing a claimant's RFC). Still, the ALJ weighed this conflict largely in Zanoubia's favor, apparently crediting both Doctor Makki's opinions and Zanoubia's testimony by finding that Zanoubia must "alternate between sitting and standing in 10-minute intervals." (*See id.* at PageID.41, 72, 505).

To be sure, those discussions were brief. But an ALJ need not discuss every piece of evidence that corroborates or contradicts a medical source's opinion. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). An ALJ's discussion of a medical source statement's supportability and consistency need only be detailed enough for a reviewing Court to follow the ALJ's rationale. *Frisby-Woods v. Kijakazi*, No. 5:22-cv-00420, 2022 WL 879493, at *6 (E.D. Ky. Mar. 23, 2022). And when considered in its entirety, the ALJ's decision here allows the Court to understand how she considered the both the supportability and the consistency of Doctor Makki's opinions.

The ALJ also supported that explanation with substantial evidence. None of the evidence Zanoubia accuses the ALJ of "ignoring"—not her MRIs, her paresthesia, nor her reduced range of motion—compel a reasonable person to find a particular RFC. (ECF No. 7-1, PageID.539–40 (internal quotation marks omitted)).

That is because these clinical findings do not track neatly onto specific functional abilities.  For any claimant, the task of assessing the impact of medical evidence on the claimant's functional abilities is far from an exact science.  And there was a wide range of reasonable functional abilities that the ALJ here could have inferred from the available evidence: just compare the diverse set of opinions reached by the four medical experts in this case.

Zanoubia offers no convincing explanation for why the ALJ's RFC finding was illogical or otherwise unreasonable.  Sure, she insists that the ALJ should have afforded more weight to certain evidence.  Yet she does not clarify why that evidence could only support Doctor Makki's opinions and not the ALJ's findings.  (*Id.* at PageID.536–41).  Because the ALJ's RFC findings sat comfortably within the spectrum of reasonable conclusions, Zanoubia's argument that the ALJ did not rely on substantial evidence is, in essence, a request for the Court to reweigh the evidence.  *See Cutlip*, 25 F.3d at 286; *see also Mullins v. Sec'y of Health & Human Servs.*, 680 F.2d 472, 472 (6th Cir. 1982).  But that, the Court cannot do.  I therefore find the ALJ's step five finding to be procedurally sound and supported by substantial evidence.

**H.      Conclusion**

For these reasons, Plaintiff's motion (ECF No. 11) is **DENIED**, the Commissioner's Motion (ECF No. 14) is **GRANTED**, and the ALJ's decision is **AFFIRMED**.

Date:  March 13, 2024                          S/ PATRICIA T. MORRIS
                                                Patricia T. Morris
                                                United States Magistrate Judge

35